UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ALLAN JOSEPH PAWLICKI,

    Plaintiff,

    v.                                                 Case No. 08-C-0764

MICHAEL J. ASTRUE,

    Defendant.

ORDER AFFIRMING THE COMMISSIONER'S DECISION AND
DISMISSING THE CASE

Plaintiff, Allan J. Pawlicki, seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act pursuant to 42 U.S.C. § 405(g). In his application for DIB, Pawlicki claimed that pleomorphic sacroma cancer has limited his ability to work since March 3, 2006. After the Commissioner denied his application initially and on reconsideration, Pawlicki requested a hearing. Administrative Law Judge Robert G. White conducted the hearing on February 5, 2008, and issued a March 24, 2008, decision finding Pawlicki not disabled. The Appeals Council denied Pawlicki's request for a rehearing, causing the decision to become the Commissioner's final decision. Pawlicki seeks a Sentence Four remand, alleging that the ALJ erred in his finding when he: (1) failed to comply with Social Security Administration Rulings 96-8p and 96-2p; (2) improperly rejected Pawlicki's testimony; and (3) failed to clarify an apparent inconsistency between the vocational expert's ruling and the ALJ's decision. For the

reasons set forth below, this court affirms the Commissioner's decision that Pawlicki is not disabled.

STATEMENT OF THE FACTS

Pawlicki was employed full-time as a trucker from 1978-1993, before working various other jobs, including maintenance, food processor, and transport driver. (R. at 49, 84.) He has graduated from high school and has completed special job training, trade or vocational courses. (R. at 41, 53.)

On February 28, 2006, Dr. Hackbarth, Department of Orthopaedic Surgery and Musculoskeletal Oncology at Medical College of Wisconsin, examined Pawlicki. (Pl. Br. at 1.) Dr. Hackbarth found a 5x5x5 cm mass in Pawlicki's left, mid lateral arm, within the brachialis muscle. (Pl. Br. at 1.) Subsequent review of an MRI revealed a heterogenous soft tissue mass involving the brachialis and brachial radialis muscle. (R. at 186-188.) Dr. Hackbarth performed an incisional biopsy on March 6, 2006, with the post-operative diagnosis of a high-grade sarcoma, lateral left arm. (R. at 133-145, 195-196.)

A May 17, 2006, MRI revealed the tumor had increased in size and involved "the entire anterior compartment of Pawlicki's arm including the biceps and brachialis muscles." (R. at 102.) Hence, Dr. Hackbarth referred Pawlicki to Dr. Perry Gould, of the Department of Radiation Therapy. (*Id.*)

Dr. Hackbarth examined Pawlicki several more times. A July 18, 2006, CT scan of Pawlicki's chest, liver/spleen and pelvis revealed an interval increase in size and number of left axillary lymph nodes. (R. 129, 205-208.)

2

On August 7, 2006, Dr. Hackbarth completed a Medicaid Presumptive Disability form. (R. 105-106.) On that form, Dr. Hackbarth advised that Pawlicki was to be admitted to the hospital on August 14, 2006, and opined that Pawlicki was unable to work or return to normal functioning for at least 12 months or had a condition that would result in death within the next 12 months. (*Id.*)

On November 30, 2006, Dr. Hackbarth opined on Pawlicki's ability to do work-related activities. (R. at 305.) He noted that Pawlicki had not completely healed or regained function in his left elbow, forearm, or hand, and that he was unable to return to his prior occupation as a van driver. (*Id.*) The report stated that he had the maximum ability to lift and carry less than ten pounds on an occasional and/or frequent basis, but there was no limit to his ability to stand, walk, or sit during an eight hour day. (R. at 306.) Dr. Hackbarth recommended that Pawlicki take unscheduled breaks every three hours because of the function of his left arm. (R. at 307.) However, his experience of pain, fatigue or other symptoms were seldom severe enough to interfere with attention and concentration. (*Id.*) Physical limitations described in the report were supported by the following medical findings: "Mr. Pawlicki has had an extensive resection of muscle from the anterior aspect of his left upper arm including most of the biceps and brachialis, thus, he does not have voluntary flexion of his elbow. He also has weak pronation and supinatio[n] of the elbow, forearm, and hand." (*Id.*)

The report concluded that Pawlicki could twist, stoop, crouch, and climb stairs, but not climb ladders because that would require the use of both hands. (R. at 308.) Symptoms of his left shoulder and elbow, included swelling, tenderness, and discomfort

plus the loss of active flexion in the left elbow. (*Id.*) The report described Pawlicki's motor loss as the inability to actively flex his elbow. (R. at 309.) Additionally, Pawlicki's physical impairment prevented him from reaching overhead with his left arm, handling grossly with his left arm, and pushing or pulling with his left arm. (*Id.*) His impairment also affected his fingering and feeling. (R. at 309.) Moreover, Pawlicki could not use his left upper extremity for anything other than fine hand motor skills directly in front of him. (*Id.*)

Dr. Hackbarth further concluded that Pawlicki should avoid all exposure to extreme cold and hazards with his left arm due to his limited use of his left upper extremity and the extensive reconstructive surgery. (R. at 309.) He should also avoid concentrated exposure to extreme heat, wetness, and humidity. (*Id.*) There were no restrictions on noise, fumes, odors, dust, gases, or poor ventilation. (*Id.*) Dr. Hackbarth believed Pawlicki would be able to use both legs and his right arm with no limitations on walking, standing, kneeling, seeing, hearing, or speaking, and has no mental deficits. (R. at 301.) Further, Dr. Hackbarth believed that Pawlicki's symptoms and limitations would be permanent. (*Id.*)

Meanwhile, on February 21, 2007, Pawlicki attended physical therapy at QuadMed Rehabilitation. The physical therapist understood that Dr. Hackbarth believed Pawlicki would have permanent disability. (R. at 299.) The therapist noted that Pawlicki was able to do some light yard work and experienced fatigue, but no real pain. (R. at 296.) Generally, Dr. Hackbarth was "happy" with Pawlicki's results. (R. at 288.) While he was generally "doing well," "doing o.k.," "doing better," and "feeling good," he was also at times "a little sore," and "a little tired." (R. at 280-304.)

The physical therapist's notes also detail Pawlicki's exercises and specify the specific amount of weights he was able to lift. On June 11, 2007, Pawlicki was able to chest press in the following pounds, reps, and sets: 25 pounds x 10 reps, 45x4. (R. at 294.) On July 16, 2007, the numbers were: 30x5, 35x4, 40x3, 45x5. (R. at 293.) On August 6, 2007, the numbers were: 40x4, 45x6, 50x10. (R. at 291.) On September 5, 2007, the numbers were: 45x6, 50x4, 60x4. (R. at 290.) The ALJ characterized these numbers, stating that 30-40 pounds was typical, and 75 pounds was a goal. (R. at 15.) Pawlicki met this goal on December 10, 2007. (R. at 288.)

The PT believed that Pawlicki was a "good candidate for return to close to prior level of function with time," and, on November 26, 2007, concluded that he "[m]ay be ready for functional assessment by MD and progression of return to some form of work status." (R. at 281.)

Pawlicki filed his application for DIB and received an adjudicative hearing. Allen R. Searles testified during the hearing as a vocational expert ("VE"). (R. at 326.) Searles opined that Pawlicki's past work categorized him as performing various unskilled and semi-skilled jobs with medium exertion levels. (R. at 327.) Further, most unskilled jobs are designed for people to use both hands. (R. at 328.) People who are one-handed can work, but the jobs have to be modified. (R. at 328.) Even though Pawlicki could stand and walk without problems, Searles opined that the RFC put him at a sedentary level. (R. at 330.)

According to the federal Dictionary of Occupational Titles, the definition of sedentary work is using force up to at least ten pounds. (R. at 329.) Searles provided the ALJ with three sedentary jobs: (1) surveillance system monitor DOT No. 379.367-010 with

5

10,640 persons employed in Wisconsin; (2) order clerk No. 209.567-014 with 9,900 people employed under such title; and (3) callout operator No. 237.367-014, 1,050 employed. (R. at 330.)

Searles was confident that a person with *only one arm*[1] but who had the ability to perform light exertion, and the abilities to sit and stand in prolonged amounts of time could be placed in a job. (R. at 331, 332, 342.) However, employees in those jobs would need to be accommodated. (*Id*.) A security systems surveillance monitor would be entering data, information, and writing reports on a computer with a keyboard designed for people to use with both hands. (R. at 332.) Generally, employers would need to accommodate *one-armed* employees because no jobs are made for *one-armed* employees. (R. at 333.) However, the same person with *limited use of one arm* rather than no arm could perform those three jobs without accommodation. (R. at 340, 342). Searles further testified that most of the light exertional jobs probably require frequent use of both hands. (R. at 340).

The ALJ noted the five-step sequential evaluation used in determining whether an individual is disabled, pursuant to the Social Security Administration's authority under the Social Security Act. 20 C.F.R. § 404.1520(a). These steps are followed in order unless a claimant is found to be disabled at a particular step. (R. at 10.)

Proceeding through the sequential five-step evaluation process, the ALJ found that: (1) Pawlicki has not engaged in substantial gainful activity since March 4, 2006,

---

[1] This is a summary of two hypotheticals comparing (1) a one-armed man dealing with an amputation or the like with (2) a man with one arm fully functional, but the other of only limited function. Emphasis is added to draw attention to the hypothetical being summarized.

6

the alleged onset date of disability, (2) he suffers from severe impairment under 20 C.F.R. § 404.1520(c) - primarily, post surgical changes to his left arm, (3) he does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; and (4) he is unable to perform any past relevant work. (R. at 11.) At step 5, the ALJ found pursuant to 20 C.F.R. § 404.1520(g) that he could do other work. (R. at 11.)

The ALJ supported this finding at step 5 after considering Pawlicki's residual functional capacity, age, education, and work experience. (R. 11, 16, 17.) Most importantly, the ALJ determined that Pawlicki has the residual functional capacity to perform light work as defined by 20 C.F.R. § 404.1567(b). (R. at 11.) In addition, the ALJ determined that other jobs existed in the national economy that he could perform. (R. at 16-7.)

## CONCLUSIONS OF LAW

The district court's review is limited to determining whether the Commissioner's decision is supported by "substantial evidence." 42 U.S.C. § 405(g). The Commissioner's findings are conclusive if supported by substantial evidence. *Id*. The court reviews the entire record to determine if the Commissioner's decision is supported by the record. *Arkansas v. Oklahoma*, 503, U.S. 91, 113 (1992). Substantial evidence is such proof within the entire record as a reasonable mind might accept as adequate. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Outlaw v. Astrue,* 412 Fed. Appx. 894, 897

(7th Cir. 2011). The court may not substitute its judgment for that of the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

The ALJ must consider all relevant evidence, and may not discuss only that evidence that supports the ALJ's recommendations. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Zurawski v. Halter,* 245 F.3d 881, 888 (7th Cir. 2001). Moreover, the ALJ must build a logical bridge between the evidence and the result. *Apfel* at 872.

### A. 96-8p

On appeal, Pawlicki alleges two violations of 96-8p. First, he contends that the ALJ did not assess each function as required under the RFC assessment. Specifically, Pawlicki argues that (a) the ALJ did not assess his ability to sit, carry, push, and pull but admits that the ALJ assessed his ability to lift, stand, and walk; and (b) the ALJ relied on state consultants that Pawlicki could perform light work, which was unsupported by substantial evidence.

Social Security Regulation 96-8p requires the ALJ to do an RFC assessment to consider sustained work-related physical and mental activities on a regular and continuing basis. SSR 96-8p. An RFC determines the most work that a person could do regularly. *Outlaw,* 412 Fed. Appx. at 897. The RFC considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id*. When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity. *Id*.

The ALJ must address the exertional and nonexertional functions required of the particular level of work that the ALJ believes the individual can accomplish. *Id.* Additionally, the RFC must address the remaining exertional and nonexertional capacities of the individual. *Id*. "An ALJ need not discuss every piece of evidence, but must logically connect the evidence to the ALJ's conclusions so that we can provide meaningful review." *Outlaw,* 412 Fed. Appx. at 897. "RFC determinations are inherently intertwined with matters of credibility, and we generally defer to an ALJ's credibility finding unless it is patently wrong." *Id.*

The *Outlaw* decision is particularly instructive. In *Outlaw*, plaintiff alleged that various mental disorders, arthritis, back pain, and carpal tunnel syndrome rendered him disabled. *Id.* at 895. Plaintiff argued that the ALJ's failure to explain how his limitations in his ability to stand, walk, and use his hands compelled remand for his case. *Id.* at 898. The Seventh Circuit reasoned that plaintiff had not presented any medical evidence of his inability to stand or walk. *Id.* at 898. He had only presented limited evidence of the limitations of his hands. *Id.* at 898. Thus, the Seventh Circuit rejected plaintiff's arguments and affirmed the district court's decision to deny remand. *Id.* at 898.

In the instant case, the ALJ found that Pawlicki is capable of light work. 20 C.F.R. § 404.1567(b) provides that light work involves lifting no more than 20 pounds at a time with frequent lifting of objects weighing up to 10 pounds. That same section makes no mention of whether the individual must be able to accomplish the physical requirements with just the impaired limb; rather, it makes clear that the person just simply has to

accomplish the task. In other words, the issue is not whether Pawlicki's left arm can lift 10 pounds but whether he can lift 10 pounds at all.

RFC functional assessments must be performed in light of the purpose of the SSR and *Outlaw*. Repeated multiple times throughout the SSR, the RFC must only discuss the full implications of the impact of the injury on plaintiff's ability to perform regular and continuous activity. Additionally, *Outlaw* holds that the plaintiff must provide a medical basis for the alleged impairment of the exertional or nonexertional function. The ALJ need not address functions not impaired.

Pawlicki has not asserted in his brief that he cannot sit, carry, push, or pull. (Pl. Br. at 9, Reply at 3.) Rather, he has simply argued that he does not have the ability to lift. This is evident in the ALJ's opinion, such as when the ALJ stated "claimant's counsel argues that Dr. Hackbarth's assessment that the claimant could only lift less than two pounds." (R. at 15.) Indeed, Pawlicki only makes the conclusory statement that he "would be unable to engage in sustained work activity, 8 hours a day, 5 days a week, as the Commissioner would have us believe." (Reply at 3.) However, this is not a case about the ability to sit, carry, push, and pull. It is a case about lifting.

Moreover, in his decision, the ALJ stated that he "has considered other factors in addition to the objective evidence in evaluating the intensity, persistence and limiting effects of the claimant's subjective allegations. For instance the undersigned has considered the claimant's treatment history which does not fully support the claimant's allegations of physical limitations." (R. at 14.) Pawlicki was doing four sets of about five chest presses at 30-45 pounds on June 16, 2007. (R. at 293.) A chest press is a pushing

10

motion. He was also doing 12 repetitions of shoulder rows at fifty pounds. (*Id*.) A row is a pulling motion. (Pl. Br. at 18.)

Also, the ALJ heard many supportive facts during the hearing. Though Pawlicki does not like to shovel snow, he can still do so. (R. at 335-6.) Shoveling is a pulling motion (and lifting). He mows the lawn (R. at 334), which has some pushing motions associated, even if a self-propelled mower reduces the total exertion. Pawlicki carries a weed whacker. (R. at 334.) In addition, he carries groceries; carries gallons of water into the house; carries cleaning supplies while he cleans; and carries the pots, pans, utensils, and food required when he cooks. (R. at 337-338.) All of the physical activities that Pawlicki presented at the hearing suggest that he was fully capable of physical exertion of 10 pounds regularly and 20 pounds occasionally during a regular business day.

Finally, an Ability to Do Work-Related Activities form submitted by Pawlicki as an exhibit indicates that his treating physician believed that he could lift and carry less than 10 lbs. for 1/3 of an 8 hour day and that he had no limit to sitting with normal breaks during an 8 hour day. (R. at 306.) Additionally, there was no indication that he would be unable to perform work related activities unrelated to problems identified with his left arm. (R. at 17.) Throughout the record, Pawlicki's lifting ability was the only problem identified.

Pawlicki makes another argument with respect to 96-8p, that the "ALJ's second error in making this RFC assessment was that he relied on the opinions of the State Agency consultants who also opined Plaintiff could perform light work." (Pl. Br. at 9.) It appears that he intended to assert that the ALJ improperly rejected the treating doctor's

opinion in favor of the state agency consultant's opinion.[2] Even construing this argument favorably to Pawlicki, the ALJ made only passing mention of the state agency consultants. Indeed, the ALJ simply stated in his opinion that "consultants who reviewed the claimant's file opined that the claimant was capable of light work activity (Exhibits 4F and 5F). This opinion is reasonably consistent with the record as a whole and is not inconsistent with the limitations as described above." (R. at 16.) The ALJ did not rely exclusively on the agency consultants; rather, the ALJ relied on the specific facts mentioned above and found the agency consultants' statements to be consistent therewith. Consistency is not necessarily a reliance.

Based upon the ALJ's decision, and the entire record, it is quite clear that Pawlicki submitted that his physical capabilities associated with lifting were the only limitations he had. Even if he had alleged more, there is ample evidence in the record to show that the ALJ was not patently wrong in his decision that Pawlicki was not disabled. In making that determination, the ALJ did not violate any provision of SSR 96-8p.

**B.    96-2p**

**1.    Treating Physician's Opinion**

Next, Pawlicki maintains that the ALJ improperly rejected the treating physician's opinion of his abilities. Specifically, Pawlicki contends that the ALJ (1) improperly rejected the treating physician's diagnosis that his injury was permanently debilitating, (2) improperly believed that the treating physician did not treat Pawlicki

---

[2] The ALJ's rejection of certain medical findings is discussed below under a 96-2p analysis, and is found to be proper. This discussion is limited to the purportedly improper reliance on the state agency consultants.

12

between November 2006 and November 2007, (3) improperly rejected the treating physician's diagnosis that he could not lift 10lbs., and (4) improperly rejected his onset date.

Social Security Regulation 96-2p governs the support of medical opinions rendered in adjudications. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. Controlling weight may be given to medical opinion only in appropriate circumstances, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources. 20 C.F.R. § 1527(d)(2) contains factors to evaluate. However, "other" is a factor; the issue here is not whether all factors were addressed specifically but whether the ALJ provided good reasons to reject the treating doctor's opinion.

At the outset, Pawlicki accurately argues that the ALJ relied improperly on the purported fact that the treating doctor did not treat Pawlicki between November 2006 and November 2007. Such reliance is improper. Pawlicki was treated by Dr. Hackbarth during those times. However, the ALJ explicitly relied on two reasons to reject the treating doctor's finding and the second reason is proper.

As mentioned above, the issue here is whether Pawlicki can lift 10 pounds at all; whether his impaired arm can lift 10 pounds is immaterial. The record contains evidence that Pawlicki routinely used exercise weights of 30-60 pounds. His goal was clearly 75 pounds for particular exercises. The ALJ made explicit reference to these weights. (R. at 15.) And, the ALJ rejected the treating doctor's opinion stating, "the claimant had no impairment to his right, dominant arm so it is difficult to imagine that Dr.

13

Hackbarth would have meant to preclude the lifting of ten pounds from even his [Pawlicki's] unaffected arm." (R. at 15.) Hence, the ALJ's decision was not patently wrong.

Additionally, there was clear medical evidence that Pawlicki's therapy was improving as stated by the ALJ. On June 11, 2007, he was able to chest press in the following pounds, reps, and sets: 25 pounds x 10 reps, 45x4. On July 16, 2007, the numbers improved: 30x5, 35x4, 40x3, 45x5. The number improved again on August 6, 2007: 40x4, 45x6, 50x10. There was additional improvement on September 5, 2007: 45x6, 50x4, 60x4. Moreover, Pawlicki met his 75 pounds goal.

Finally, the ALJ noted a discrepancy between Pawlicki's claimed onset of symptoms in March 2006 and his first appointment with a doctor in May 2006. While the court questions the materiality of this fact, the ALJ provided very specific facts to support his decision; the ALJ held the onset date to be when the Pawlicki decided that the injury was severe enough to schedule an appointment with a doctor. The court finds this determination to be both supported by substantial evidence and immaterial.

On specific facts, the ALJ found that Pawlicki could lift 10 pounds, and that his impairments were improving. On that basis, he rejected Dr. Hackbarth's opinions to the contrary. Unlike Pawlicki's assertions, this is not reversible error. The ALJ was not patently wrong in his decision. Rather, his decision is supported by substantial evidence.

### 2. Pawlicki's Testimony

Next, Pawlicki contends that the ALJ did not provide analysis sufficient to show a logical bridge to the ALJ's rejection of the Pawlicki's testimony. Specifically, he contends that the ALJ found that "objective medical evidence does not support claimant's allegations of disabling physical limitations." Pawlicki points to several instances of

purportedly ignored evidence, including that he was (1) numb in his left belly, (2) a little sore after mowing the lawn, (3) fatigued following therapy, (4) a little stiff and sore, (5) sore and tired, and (6) a little tired. Additionally, Pawlicki argues that the ALJ improperly described him as carrying 30-40 lbs, and that the ALJ failed to describe him doing anything other than household chores.

Social Security Regulation 96-7p governs findings on the claimant's credibility. The ALJ must provide specific reasons for a finding on credibility, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight that he gave to the individual's statements and reasons for that weight. SSR 96-7p.

The ALJ reviewed all of the information that Pawlicki claims he did not. The ALJ characterized all of these arguments by Pawlicki and rejects them by indicating that yard work resulted in "some fatigue but no real pain." (R. at 13, at 14.) Additionally, the ALJ noted that follow-up examinations revealed that Pawlicki had "no complaints of any significant pain." (R. at 13.) The word "little" appears often in the records, and in Pawlicki's own filings. The ALJ has not rejected these or Pawlicki's crebility. Rather, the ALJ has merely considered the facts, and has found that they do not reflect significant pain that would impact Pawlicki's ability to lift ten pounds.

Additionally, Pawlicki has attacked the ALJ's reliance on household chores. The record provides examples of Pawlicki's household activities and the exercises that he performed in physical therapy. Pawlicki relies exclusively on *Gentle v. Barnhart*, 2005 U.S. App. LEXIS 26638 to the extent that he asserts that an ALJ cannot exclusively rely on

15

household chores to predict abilities at work.[3] (Pl. Br. at 14.) Even if it were factually true that the ALJ in the instant case relied only on household chores, he has improperly characterized *Gentle's* holding.  In *Gentle*, Judge Posner stated that the ALJ only addressed household chores, and did not address uncontested evidence that reveals "that [plaintiff] performs these chores with difficulty, and with the aid of her sister, a neighbor, and another woman." *Gentle* at 3. *Gentle* does not stand for any new assertion that ALJs cannot rely only on household chores; rather, it repeats the often-expressed law that ALJs must consider all evidence, even evidence that does not favor their decision.

As the Commissioner indicated in his response brief (*see* footnote 9), Pawlicki does not indicate a single activity that the ALJ failed to consider that was not a household chore. Instead, he repeats his arguments that household chores fatigued him. As described above, the ALJ considered Pawlicki's statements regarding fatigue to be insignificant. Significance is a credibility determination on the part of the ALJ that this court will not overturn.  The ALJ relied on every physical activity in the record, including household chores and PT exercises.

The court notes that early in the opinion, the ALJ identifies that Pawlicki maintains that he "is unable to use his left arm due to loss of strength and pain." (R. at 12.) In the next paragraph, the ALJ states that the Pawlicki's "statements concerning the

---

[3] Pawlicki also tries to argue that the Commissioner has waived its response because it has not "specifically responded" to his arguments.  The Commissioner responded, arguing that the "ALJ did not find that plaintiff's activities were the equivalent of substantial gainful activity.  However, the ALJ reasonably considered the significant activities Pawlicki was able to perform using his unimpaired dominant right arm." (Def. Reply Br. at 9.)  This argument is not waived.

16

intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the" RFC. (R. at 12.)

While confusing when taken out of context like Pawlicki has done, these statements should be read together in accordance with their proximity. It does not appear that the ALJ rejected Pawlicki's credibility entirely. Rather, the ALJ rejected the legal claims and conclusions of Pawlicki while relying on Pawlicki's evidence. Indeed, by the facts that Pawlicki placed into the record, there is substantial evidence sufficient to support the ALJ's recommendations.

### 3. Vocational Witness Testimony

Finally, Pawlicki contends that the ALJ did not resolve an inconsistency between the vocational witness expert and the Dictionary of Occupational Titles ("DOT"). He argues that the ability of a one-armed person to perform the job of surveillance system monitor is inconsistent with the VE's testimony that there were no unskilled jobs for a one-armed person unless the jobs were modified. Additionally, Pawlicki argues that all three jobs mentioned by the VE have mental capacity reasoning levels of 3, which Pawlicki argues is beyond Pawlicki's mental capacity as an unskilled worker. Essentially, it appears that Pawlicki objects to having to be re-trained for a new job.

Social Security Regulation 00-4p requires that any inconsistency between a vocational expert ("VE") and the DOT be resolved by the ALJ. Pawlicki's basis for contending that there is a conflict between the VE testimony and the DOT is unclear. The VE made an explicit statement in the hearing that Pawlicki's prior job history ranged from unskilled to semi-skilled. (R. 327.) This indicates that Pawlicki is capable of accomplishing semi-skilled work. It is consistent that a man who graduated from high school and who has

17

some college classes could accomplish the mental reasoning required of monitoring surveillance cameras, an order clerk, or a call-out operator despite the limited use of one arm. (Def. Reply at 10, Pl. Br. at 16.)

Pawlicki may be trying to indicate that a mental reasoning level of 3 does not correspond to unskilled work. (Pl. Br. at 16.) He appears to suggest that reasoning level 3 requires three months training, while unskilled work requires no training. (Pl. Reply at 5.) Even if the VE expert had said that Pawlicki was only capable of unskilled work,[4] he has not provided an authority to establish that unskilled workers do not or cannot do work that requires three months of training. Without being able to find a colorable basis for this suggestion, the court finds persuasive the Commissioner's argument that Pawlicki could be trained in these jobs in less than three months. Indeed, as the Commissioner points out, he never argued that he could not perform the mental requirements of these jobs, and he only argued that the physical impairments of his arm prevented him from doing these jobs. (Def. Reply at 10.)

Pawlicki's arguments are unavailing in their attempt to convince this court to remand his case to the ALJ. The ALJ made a decision well supported by substantial evidence that a person with limited use of one arm can find work, and is not disabled under the Social Security Act. Consequently, Pawlicki has fallen short of proving that the ALJ was patently wrong. Now, therefore,

IT IS ORDERED that the Commissioner's decision to deny Disability Insurance Benefits to Allan J. Pawlicki is affirmed.

---

[4] He did not. He explicitly said that Pawlicki was capable of semi-skilled work.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 20th day of July, 2011.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE